**TURTUR & ASSOCIATES, INC., Mario Turtur, and Steve Turtur, Appellants,**

v.

**Tom ALEXANDER, Individually, and Alexander & McEvily, Appellees.**

No. 01–96–01595–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 31, 2001.

Dissenting Opinion on Overruling of Rehearing En Banc Sept. 12, 2002.

---

**23.** There was evidence that the girl, age 14, was not a virgin. *Id.*

Daryl L. Moore, Storey, Moore & McCally, P.C., Valorie W. Davenport, Davenport Legal Group, Houston, for Appellants.

Marie R. Yeates, Vinson & Elkins L.L.P., Sam W. Cruse, Jr., D. Wayne Clawater, Cruse, Scott, Henderson & Allen, L.L.P., Richard B. Miller, Law Office of Richard Miller, Houston, for Appellees.

Panel consists of MIRABAL, WILSON, and ANDELL,* JJ.

## OPINION

MARGARET GARNER MIRABAL, Justice.

This is an appeal of a take-nothing judgment against plaintiffs in a legal malpractice lawsuit. Plaintiffs complain about two separate matters: (1) a judgment notwithstanding the verdict following a five-week legal malpractice jury trial, and denial of leave to file a post-verdict trial amendment; and (2) a partial summary judgment entered prior to the start of trial. Defendants assert six cross-issues related to the same matters. We reverse.

## I. Case Background

### A. Underlying Lawsuit

Mario Turtur and his sons, Steve and Chris, are securities brokers. Mario owns Turtur & Associates, Inc., a securities firm. Between 1982 and 1984, Turtur & Associates, Inc., entered into various agreements with McKellar Ranch, Inc. to market and sell cattle embryo investment packages.

In 1985, Turtur & Associates, Inc. filed suit against Dr. Lee McKellar and McKellar Ranch, asserting breach of contract and fraud claims. Soon thereafter, McKellar Ranch filed bankruptcy proceedings and the relevant claims against the Ranch were severed and became part of an adversarial proceeding in federal bankruptcy court.[1]

On June 17 and 18, 1987, the bankruptcy court tried the adversary proceeding in Tyler, Texas. Judy Mingledorff, an attorney with Alexander & McEvily, and John Hardy, a Tyler bankruptcy lawyer, represented Turtur & Associates, Inc. at the adversary proceeding.

Two years later, on July 20, 1989, the bankruptcy court entered a judgment mainly in favor of McKellar Ranch and against Turtur & Associates, Inc.[2] Ulti-

---

* Justice Eric Andell's term at the First Court of Appeals expired December 31, 2000.

1. *McKellar Ranch, Inc. v. Turtur & Associates, Inc.*, Adversary Proceeding No. A–86–171, in Bankruptcy Case No. TX–86–00154, in the United States Bankruptcy Court for the Eastern District of Texas, Texarkana Division.

2. Specifically, the bankruptcy court (1) denied Turtur & Associates, Inc's claim for $212,000 in commissions for donor cow interests; (2) denied its claim for $192,000 in commissions for embryo transplants; (3) awarded Turtur & Associates, Inc. $50,000 for unauthorized use of an embryo prospectus; (4) awarded it $24,131.20 for unreimbursed bonding fees; and (5) denied its claim for $1,500 in accounting expenses. Further, the court found in McKellar Ranch's favor on its fraud counterclaim against Turtur & Associates, Inc., entering judgment against Turtur & Associates, Inc. in the amount of $179,800.

mately, the parties settled, and as part of the settlement, Turtur & Associates, Inc. dismissed its suit against McKellar, individually.

## B. Legal Malpractice Lawsuit

On November 30, 1989, Turtur & Associates, Inc. filed suit against Alexander & McEvily, and against Tom Alexander, individually, alleging legal malpractice in connection with the trial of the adversary proceeding. The live pleading at the time of trial asserted claims for negligence, gross negligence, legal malpractice, fraud, breach of fiduciary duty, and violation of the Texas Deceptive Trade Practices Act (DTPA).[3] Turtur & Associates, Inc. alleged, in part, that Tom Alexander himself was supposed to represent it—not his less experienced associate, Judy Mingledorff. It further alleged that Mingledorff was completely unprepared to go to trial in the adversary proceeding.

In amended pleadings, Mario Turtur and Steve Turtur, d/b/a the Turtur Family Partnership (the Turturs) asserted an additional claim alleging Alexander and his firm had engaged in an unauthorized sale of cattle, resulting in injury to the Turturs.

The trial court granted a summary judgment in favor of the defendants in connection with the Turturs' claim that defendants authorized an improper sale of the Turturs' cattle. The remainder of the case proceeded to trial.

The five-week malpractice trial began on October 21, 1996.[4] The jury answered each liability question in favor of Turtur & Associates, Inc. Specifically, the jury found: (1) Tom Alexander and his firm were negligent; (2) their negligence was the proximate cause of Turtur & Associates, Inc.'s damages; (3) Tom Alexander

was 60% negligent, and his firm was 40% negligent; (4) Alexander and his firm engaged in false, misleading, or deceptive acts that were a producing cause of Turtur & Associates, Inc.'s damages; (5) Alexander and his firm engaged in unconscionable actions or courses of actions that were a producing cause of Turtur & Associates, Inc.'s damages; (6) Alexander and his firm engaged in such conduct with actual awareness of the falsity, deception or unfairness of the conduct; (7) Turtur & Associates, Inc. would have received a more favorable judgment in the adversary proceeding but for the conduct of Alexander and his firm; and (8) a favorable judgment in the adversary proceeding would have been collectable. The jury awarded Turtur & Associates, Inc. $3 million in actual damages, plus punitive damages.

Alexander and his firm filed a motion to disregard certain jury findings; the trial court granted the motion, in part, and entered a take-nothing judgment in favor of Alexander and his firm. Turtur & Associates, Inc. now appeals the take nothing judgment. Mario and Steve Turtur also appeal the pretrial partial summary judgment regarding the cattle sale.

## II. Judgment Notwithstanding the Verdict

In issue one, Turtur & Associates, Inc. asserts the trial court erred in entering the judgment notwithstanding the verdict. Defendants had requested the trial court to disregard the jury's answers to the following questions:

*Question No. 1*

Did the negligence, if any, of the persons named below in connection with the preparation or trial of the Adversary

---

3. Texas Deceptive Trade Practices–Consumer Protection Act, section 17.46(b).

4. A previous 14–week trial, before another judge, had resulted in a mistrial.

Proceeding of June 17 and 18, 1987 proximately cause damages to Turtur & Associates, Inc.?

Answer: (a) Tom Alexander <u>yes</u>
 (b) Alexander & McEvily <u>yes</u>

### Question No. 3

What percentage of the negligence that caused damage do you find to be attributable to each of those found by you to have been negligent?

Answer: (a) Tom Alexander <u>60</u>
 (b) Alexander & McEvily <u>40</u>
 (c) Turtur & Associates, Inc. <u>0</u>

### Question No. 4

Did the Defendants engage in any of the following false, misleading or deceptive acts during their representation of the Plaintiffs which was a producing cause of any loss or harm to any Plaintiff?

(1) Representing that their legal services had or would have characteristics, uses, benefits or quantities which they did not have; or

(2) Representing that their legal services are or will be of a particular standard or quality if they were of another; or

(3) Representing that an agreement conferred or involved rights that it did not have or involve, or which were prohibited by law; or

(4) Failing to disclose information about services that was known at the time of the transaction with the intention to induce another into the transaction; or

(5) Causing confusion or misunderstanding as to the source, sponsorship, approval, characteristics, or benefits of their services.

"PRODUCING CAUSE" is an efficient, exciting or contributing cause, which in a natural sequence produces the loss or harm complained of, if any. There can be more than one producing cause.

ANSWER: "Yes" or "No" for each of the following:

(a) Tom Alexander <u>yes</u>
(b) Alexander & McEvily <u>yes</u>

### Question No. 5

Did Tom Alexander and/or Alexander & McEvily engage in any unconscionable actions or courses of action during their legal representations of plaintiffs that was a producing cause of any loss or harm to any plaintiff?

Answer: (a) Tom Alexander <u>yes</u>
 (b) Alexander & McEvily <u>yes</u>

### Question No. 6

Would Turtur & Associates, Inc. have received a more favorable judgment from the Adversary Proceeding of June 17 and 18, 1987 had the conduct, if any, you found not occurred?

Answer: <u>yes</u>

### Question No. 7

Would a more favorable judgment on the affirmative claims of Turtur & Associates, Inc. from the Adversary Proceeding of June 17 and 18, 1987 have been collectable from McKellar Ranch, Inc.?

Answer: <u>yes</u>

As relevant here, defendants argued that the jury's answers to these questions should be disregarded because plaintiff had presented no evidence of causation. It was defendants' position that the only way to prove causation in a legal malpractice case was through expert testimony.[5] Defendants argued that plaintiff presented no expert witness testimony on causation, and therefore defendants were entitled to judgment as a matter of law. The trial court agreed. It partially granted defen-

---

**5.** This is the main issue in this case. We disagree with defendant's position under the facts of the case.

dants' motion, disregarding the jury's answers to Question Nos. 1, 4, 5, and 6.[6] On appeal, Turtur & Associates, Inc. asserts the trial court erred.

## A. Standard of Review

To affirm the grant of a motion for judgment notwithstanding the verdict, the reviewing court must determine that no evidence supports the jury's verdict. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The appellate court reviews the record in the light most favorable to the verdict, considering only the evidence and inferences that support the verdict and rejecting the evidence and inferences contrary to the verdict. *Mancorp, Inc.*, 802 S.W.2d at 227–28; *John Masek Corp.*, 848 S.W.2d at 173. If there is more than a scintilla of competent evidence to support the jury's verdict, then the judgment notwithstanding the verdict must be reversed. *Id.*

## B. Causation

The issue before us is whether there is legally sufficient evidence to support a finding of "proximate cause" or "producing cause" of harm to Turtur & Associates, Inc. by defendants' actions.[7] The jury received the following relevant definitions: "PROXIMATE CAUSE," when used with respect to the conduct of the Defendants, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred; and in order to be a proximate cause, the act or omission complained of must be such that an attorney using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event. "PRODUCING CAUSE" is an efficient, exciting or contributing cause, which in a natural sequence produces the loss or harm complained of, if any. There can be more than one producing cause.

### 1. General Rules

 To recover on a claim for legal malpractice in earlier litigation, the plaintiff must show that it would have prevailed in the underlying action but for its attorney's negligence. *Jackson v. Urban, Coolidge, Pennington & Scott*, 516 S.W.2d 948, 949 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.); *Mackie v. McKenzie*, 900 S.W.2d 445, 449 (Tex. App.—Texarkana 1995, writ denied). The

---

**6.** The trial judge did not disregard the jury's answers to Questions Nos. 3 and 7.

**7.** No issue was raised in the trial court about the sufficiency of the evidence to support the jury's finding that defendants were negligent, that defendants engaged in false, misleading or deceptive acts during their representation of plaintiffs, and that defendants engaged in unconscionable actions or courses of action during their legal representation of plaintiffs. The jury received the following definition of negligence:

"Negligence," when used with respect to the conduct of the Defendants, means failure to use ordinary care; that is failing to do that which an attorney of ordinary prudence would have done under the same or similar circumstances or doing that which an attorney of ordinary prudence would not have done under the same or similar circumstances.

The false, misleading or deceptive acts the jury were to consider are set out in question No. 4, which has already been quoted. The jury received the following definition of unconscionable action or course of action:

"UNCONSCIONABLE ACTION OR COURSE OF ACTION" means an action or course of action which, to a person's detriment, results in a gross disparity between the value received and the consideration paid in a transaction involving the transfer or consideration.

determination of proximate cause in a legal malpractice case is usually a question of fact. *Millhouse v. Wiesenthal,* 775 S.W.2d 626, 627 (Tex.1989). Under the DTPA in a malpractice case, establishing producing cause requires the same factual causation as proximate cause, but lacks the foreseeability element embraced by the proximate cause standard. *Mackie,* 900 S.W.2d at 449.

 As a general rule, expert testimony is necessary to prove the element of causation in a legal malpractice case. *See Onwuteaka v. Gill,* 908 S.W.2d 276, 281 (Tex.App.—Houston [1st Dist.] 1995, no writ). However, in some cases, expert testimony on causation is not necessary because the causal relationship between the attorney's negligence and the client's loss is so obvious that lay people are competent to resolve the issue. *See Delp v. Douglas,* 948 S.W.2d 483, 495 (Tex.App.—Fort Worth 1997), *rev'd on other grounds,* 987 S.W.2d 879 (Tex.1999); *Streber v. Hunter,* 221 F.3d 701, 726 (5th Cir.2000).

## 2. Factual Background

 In their petition, plaintiffs alleged, in part, the following:

On or about the 10th day of April, 1981, Plaintiff TURTUR & ASSOCIATES, INC. did specifically, and in writing, contract with Defendants Alexander and Alexander & McEvily ["The Corporation"] to represent Plaintiff in matters arising in connection with the bankruptcy adversary action styled *McKellar Ranch, Inc., Plaintiff v. Turtur & Associates, Inc., Defendant,* Adversary Proceeding No. A–86–171, in Bankruptcy Case No. TX—86–00154, pending in the United States Bankruptcy Court for the Eastern District of Texas, Texarkana Division ("Adversary Action").

Pursuant to the specific contract, Alexander agreed to personally serve as trial counsel at the Adversary Action for Plaintiff TURTUR & ASSOCIATES, INC. and would otherwise personally direct, supervise, oversee and control the handling of Plaintiff's claims, defenses and ultimately any matters directly related to or arising from the resolution of that case. Furthermore, it was contemplated, and expressly represented and promised to Plaintiff by Alexander, that competent and experienced bankruptcy co-counsel and/or associates would be employed and utilized by Defendants Alexander and the Corporation to assist Alexander in representation of Plaintiff TURTUR & ASSOCIATES, INC. in the Adversary Action.

Defendants were aware that the claims by Plaintiff in the Adversary Action aggregated the sum of $479,631.20, exclusive of costs, attorney's fees and other interests associated therewith.

Throughout Defendants' representation of Plaintiff, TURTUR & ASSOCIATES, INC. Defendant Alexander constantly represented and reassured Plaintiff TURTUR & ASSOCIATES, INC. that he personally would try the case and was personally involved in supervising the discharge of professional services by the Corporation and co-counsel associated therewith.

The Adversary Action was set for and proceeded to trial on June 17, 1987; however, Alexander failed to appear. Although Alexander had known of the firmness of the trial setting at the time of his retention and acceptance of employment, rather than appear personally, as agreed, or even attempt to present and have heard a motion for continuance at the time he believed it appeared that he would be unable to do so, Alexander and the Corporation sent Defendant Mingledorff, with a motion for continuance in hand, to the Tyler Bankruptcy

Court on the day of trial and attempted to obtain an excuse for Alexander's absence. The motion for continuance was denied and defendant Mingledorff found herself in a trial of a complex, civil bankruptcy matter on June 17, 1987, and June 18, 1987; a task for which she had no prior experience and for which she found herself inadequately prepared and without the necessary expertise.

Defendant Alexander and the Corporation knew of the June 17, 1987 trial setting when employment was accepted. Defendants failed to adequately schedule their affairs so as to enable Alexander to appear at the trial in the Adversary Action as promised, failed to fully and adequately prepare for the trial of the Adversary Action on June 17, 1987, and, when it became apparent that counsel did not intend to appear and be ready to proceed to trial on the set date, failed to timely file and urge a motion for continuance or to arrange for or advise Plaintiff to seek other competent counsel to represent it in the Adversary Action due to Defendant's inability to represent Plaintiff pursuant to their contract. Defendant also failed to refund any and all retainers, fees, etc. paid Defendant pursuant to the contract based upon the erroneous representations whereby Alexander was to personally try, supervise and direct the case and legal matters related thereto.

As a proximate result of Defendant's failure to appear at the time of trial and to adequately prepare and represent Plaintiff's interest in the Adversary Action, Plaintiff not only lost its affirmative claims for relief (commissions of $479,000 plus attorney's fees, interest and costs), but Plaintiff, then also counter defendant, suffered a judgment of $129,850 and a finding of fraud entered against it as a result of the 1987 hearing.

As a result of the loss of the Plaintiff TURTUR & ASSOCIATES, INC.'s claims for relief and the findings of liability against it by the Court, Plaintiff has been damaged in the amount not less than $608,850 plus the fees charged Plaintiff TURTUR & ASSOCIATES, INC. by Defendants ($46,405) and the value of good and valuable consideration that they were forced to forego in compromise and settlement of the resulting two judgments for which sums Plaintiff TURTUR & ASSOCIATES, INC. herein sues.

. . . .

Plaintiff TURTUR & ASSOCIATES, INC. contends that the failure of Alexander to appear at the trial of the Adversary action and the failure of Alexander and the Corporation to represent the Plaintiff adequately, was negligent, both gross and ordinary. Additionally, the failure of the Corporation to provide Alexander, as contracted, or an experienced and prepared attorney to appear at such adversary proceedings was also negligent, both gross and ordinary. The failure of Alexander and the Corporation in not securing a continuance prior to the date of the adversary proceeding, in sending Defendant Mingledorff to attempt to obtain a continuance, unprepared to go forth if it was denied, resulted in the following acts and/or omissions, among others, by Mingledorff: 1) failure to be fully and properly prepared for trial; 2) failure to properly prepare the clients for trial; 3) failure to have the opportunity to properly evaluate and decide on the evidence to be presented; 4) failure to make timely objections to evidence and testimony; 5) allowing the introduction of hearsay; 6) and failure to make various other evidentiary objections; and 7) failure to take such other action as necessary to protect the clients' rights and interests. Such fail-

ures to adequately represent the Plaintiff in a competent manner by professionals who knew, or should have known, of the various problems certain to occur as a result of their failure to properly prepare for trial, appear and/or failure to timely file and seek a continuance and/or failure to have more experienced counsel violated the duties of care which they, and each of them owed to the Plaintiff.

. . . .

By allowing Plaintiff to rely on Defendants' express and implied representations and failing to provide adequate and competent legal services, Defendants committed legal malpractice, negligence and fraud causing Plaintiff, TURTUR & ASSOCIATES, INC. to be damaged in the amount of the specific sums and elements described above.

. . . .

Defendants jointly and/or severally totally disregarded and breached [their] fiduciary duty and the obligations and responsibilities arising therefrom by, *inter alia*, (1) failing to advise Plaintiff that Defendants, and each of them, did not possess the requisite skill and abilities necessary to represent Plaintiffs in the matters entrusted to them; (2) failing to properly advise and inform Plaintiff of actions taken by Defendants in its behalf; (3) failing to properly, adequately and timely prepare for and attend the trial of the Adversary Action so as to protect and secure the property rights of Plaintiff TURTUR & ASSOCIATES, INC. asserted therein; (4) failing to advise Plaintiff TURTUR & ASSOCIATES, INC. that Alexander would not appear at the trial of the Adversary Action so as to enable Plaintiff to secure other experienced counsel for said trial; (5) ALEXANDER's failing to attend the trial of the Adversary Action; (6) failing to timely advise Plaintiff of the effect on Plaintiff TURTUR & ASSOCIATES, INC.'s rights and claims in the Adversary Action as a result of Alexander's failure to appear at trial; (7) failing to advise Plaintiffs that it should retain other counsel to represent it in the Adversary Action due to Defendants' lack of experience and familiarity with bankruptcy matters of this nature and their inability to appear at the trial of the case as originally contracted and represented; (8) failing to discharge their duties and obligations to Plaintiffs in accordance with that standard which is required of legal counsel in same or similar circumstances, in view of the fiduciary relationship existing between the parties; (9) otherwise failing to represent Plaintiffs in a fashion consistent with their professional and legal obligations.

As to causation of harm, viewing the record in the light most favorable to the jury's findings of proximate cause and producing cause, considering only the evidence supporting the findings, and disregarding all evidence contrary to the findings, a summary of the evidence follows:

Turtur & Associates, Inc. retained Tom Alexander, an experienced 40 year trial lawyer who had handled 50 adversary proceedings in bankruptcy court, and paid him a $10,000 non-refundable retainer. Tom Alexander told the Turturs he would personally try the case and would personally oversee the preparation for trial. As it turned out, Tom Alexander devoted a total of two hours billed to the case, both hours spent meeting with the Turturs. Alexander did not participate in pretrial strategy or discovery. His associate Judy Mingledorff, who had never "first chaired" a civil trial and had no bankruptcy court experience, handled the case through trial. Although local counsel in Tyler was re-

tained, Mingledorff acted as the lead trial counsel. The jury in the present case was presented with (1) the evidence that had been introduced in the adversary proceeding in the bankruptcy court, and (2) additional evidence that plaintiffs claimed should have been introduced at the adversary proceeding, but was not. The jury heard that, in the adversary proceeding, attorney Mingledorff did not call Steve Turtur to testify, even though he was available to testify upon notice and he was primarily responsible for dealing with McKellar since early 1984. Steve Turtur was the individual in the best position to prove up Turtur & Associates, Inc's commissions due on the sale of the donor-cow interests, yet he was not called as a witness. Further, attorney Mingledorff waited until the day before trial to call plaintiff Mario Turtur, president of Turtur & Associates, Inc., to tell him he would need to come to Tyler to testify. The minute Mario Turtur arrived at the courtroom, he was put on the stand without consultation with his attorney. Attorney Mingledorff's direct examination of Mario Turtur covers only 16 double-spaced pages in the reporter's record. Cross-examination covers nine pages, and attorney Mingledorff asked no questions on redirect. At the malpractice trial, both Mario and Steve Turtur testified at length before the jury; Mario's testimony on direct and cross-examination covers 1318 pages of the reporter's record, and Steve's testimony covers 505 pages of the reporter's record.

At the bankruptcy adversary proceeding, attorney Mingledorff called only two witnesses to testify on behalf of Turtur & Associates, Inc.: Mario Turtur and his son, Chris Turtur. There was evidence at the malpractice trial that Mingledorff did not depose, or call as witnesses at the adversary proceeding, at least 10 other witnesses who could have given relevant and favorable testimony in support of Turtur & Associates, Inc.'s liability and damages claims.

Ms. Mingledorff testified by deposition as follows:

> Mingledorff: I never expected to be trying their case. I never had any discussion with Tom that I would be trying their case. Tom had never expressed any inkling that I would be trying their case. . . . Tom always talked with the Turturs in front of me and talked with me alone, as if the case was his to try. I never heard anything different.
>
> Q. So everything you saw or heard, until the Judge told you to go to trial in the courtroom in Tyler, Texas, everything that you had heard prior to that time was consistent with the idea that Tom Alexander was to try the case personally. Isn't that correct?
>
> A. Absolutely.

Tom Alexander, on the other hand, testified by deposition that he was not planning personally to try the case in Tyler, but rather intended for Ms. Mingledorff to try the case.

The expert witness [8] for Turtur & Associates, Inc. testified at the malpractice trial as follows:

> Q. Based on Mr. Alexander's own admissions, sir, do you believe that he should have communicated these facts to Ms. Mingledorff as soon as he knew them to be true, that he did not intend to take the case to trial?

---

**8.** The expert witness for Turtur & Associates, Inc. was Steve Peterson, former State Bar of Texas General Counsel, whose area of focus was attorney malpractice, ethics and grievance matters.

A. In my opinion he should have, just as soon as he knew it, communicated both to the Turturs and Ms. Mingledorff.

The expert further testified that it was his understanding from the materials he reviewed that the Turturs specifically wanted someone with the unique qualifications, qualities, and experiences of "a Tom Alexander," explaining that:

I know Mr. Alexander. I know his reputation. I know his experience. He's a very fine trial lawyer.

Instead, Ms. Mingledorff was the trial attorney who handled the case for the firm. The evidence indicated Mingledorff had no experience in civil court. She had been an assistant district attorney for approximately 10 years, and had been employed by Tom Alexander's firm for about two weeks at the time she began to work on the Turturs' case. Mingledorff represented to the Tyler bankruptcy court judge that she had not reviewed the documents that had been produced by McKellar Ranch, including accounting records and records with regard to the cattle embryos. The Turturs' expert witness testified it constituted attorney negligence not to review these relevant documents prior to trial. He further testified:

Q. So, with regard to evidence that may have appeared on these documents, I guess, formulating the overall strategy of how this case is to be presented, would that be something that might benefit from the expertise, and training, and experience and caginess of a more seasoned lawyer like Tom Alexander?

A. I would think so, yes.

. . . .

Q. And in terms of his assignment of the case to Ms. Mingledorff, with any knowledge that she may ultimately try the case—not just assigning it for discovery, but also assigning it for purposes, in his mind, he knew she might always try the case, do you believe, sir, that his handing the baton to Ms. Mingledorff in a complex bankruptcy matter in a civil case, based on her experience, was negligent?

A. I do.

. . . .

Q. What is your understanding of the duty that a supervising lawyer owes to his client, as it relates to his assignment of any matters entrusted in his care to a younger associate?

A. He has the duty of supervision. He has the duty of ensuring the attorney, to whom he assigns the matter, properly carries out the representation of the clients.

Q. And does he have to ensure that the—that by carrying out the proper representation of the client, it is to the degree and extent as understood between the client and the lawyer at the time the agreement was made?

A. Yes.

Q. So that, in supervising a young lawyer, is it—what would be Mr. Alexander's responsibility in terms of ensuring the quality of the work that was being done?

A. He has the obligation of ensuring the quality of the work done by Ms. Mingledorff to his standard, that is, Mr. Alexander's standard, the quality of work that he would, he himself, would produce.

Q. And that [of] a lawyer with his level of training and experience. Is that correct?

A. That is correct.

Q. And would be—would the failure to supervise an associate, or any lawyer that you entrusted your clients' matters to, to ensure that they performed at that level be negligent?

A. Yes.

Q. Sir, are you aware that Mr. Alexander—assuming for a moment that one of the bases that my clients hired Mr. Alexander was his—he stated he had done 50 adversary proceedings. Have you seen that?

A. I have seen that alluded to.

Q. In his own testimony?

A. Yes, ma'am.

Q. You've also seen that he has knowledge of the embryo cattle business or the—well, he has some familiarity with livestock and this type of procedure?

A. Yes.

Q. Do you see any indication that, prior to this date, Ms. Mingledorff had any knowledge of these types of procedures, as it related to any type of livestock?

A. No.

Q. And with regard to bankruptcy proceedings, did you see any indication that she had ever had any familiarity with bankruptcy adversary proceedings?

A. No.

Q. And quite the contrary. Is that correct?

A. Yes.

Q. Sir, do you believe that by assigning this case to Ms. Mingledorff, with the knowledge of her limited experience, and if Mr. Alexander did so knowing that she may, in fact, be the one to try the case in Tyler, that that was negligent?

A. I do.

Q. Do you also believe, sir, that was a breach of the parties' agreement?

A. Yes, it was.

. . . .

Q. Mr. Peterson, to the extent that there were witnesses that had relevant information that may have been critical to proving the claims by the Turturs, should they have been considered and listed under the list of witnesses to be called at the hearing?

A. In my opinion, yes, they should have.

Q. And was the failure to evaluate and list those witnesses, to the extent this jury believes they might have been important to the overall outcome of this hearing, was a failure to list those witnesses negligent?

A. Yes, it was.

Q. And to the extent that there's been evidence presented that the jury may determine that those witnesses would have been important to the outcome of the hearing, was the failure to prepare and call those witnesses here, either by depositions, subpoena, or voluntary appearance, negligent?

A. Yes.

. . . .

Q. Sir, during the trial of the case, did you also see some indication that Ms. Mingledorff—did you see some other indications that Ms. Mingledorff may not have been familiar— or as familiar with the Rules of Civil Evidence or Civil Procedure?

A. Yes, I did.

Q. What—to the extent, can you give us some examples of that?

A. The one that sticks in my mind is her comment that she didn't know how to cross-examine a deposition—

Q. Okay.

A. —when it was read into evidence.

Q. And that was—do you remember if that was the deposition of David Shutts, or you don't remember?

A. I frankly don't remember whose deposition. I remember the comment. I don't remember the deposition, whose it was.

Q. Sir, if a lawyer does read—for example, if Mr. Ritcheson had read part of the deposition of one of the witnesses, David Shutts, is there a method of cross-examining by deposition?

A. Certainly. You can cross-examine at the deposition. And you read your portion of the examination of that witness into the record, just as the author of the deposition reads that portion that he or she wishes to offer.

Q. So that, if this jury has heard evidence that should have been presented at the trial with regard to the discussions about payment of commissions before December 1st versus after December 1st—without going into the nature—if this jury has heard testimony that relevant evidence was included in a deposition, in a deposition that wasn't introduced, does it appear to you that the failure of Ms. Mingledorff to understand how to cross-examine during a deposition resulted in evidence that was relevant to the case not being presented?

A. Yes.

Q. And, therefore, sir, do you find that her failure—or that the fact that she didn't know how to cross-examine by a deposition—was negligent in terms of a lawyer who was presenting a civil case?

A. Yes.

. . . .

Q. [W]ith regard to these objections, for example, in particular, let's start with—we just finished with Joyce and hearsay. Do you believe that a lawyer with—that Mr. Alexander, with his seasoned skill and experience, would have had the experience to properly object and timely object to that piece of evidence?

A. Yes.

Q. Sir, do you believe that a lawyer with Mr. Alexander's level of experience and with his unique abilities would and should have participated very actively in the pretrial order and not signed off on a list that said "those witnesses listed by McKellar?"

A. Yes.

Q. Do you believe that a lawyer with Mr. Alexander's skill and experience would have reviewed the boxes of production that were presented in response to his Request for Production before he signed off on the pretrial order and exhibit list?

A. For one, I think a lawyer of Mr. Alexander's skill and experience would have sent a Request for Production—which was not sent in the bankruptcy adversary proceeding. And I believe that, yes, in my opinion, he would have reviewed those documents.

Q. And certainly before he did his final exhibit list?

A. Yes.

. . . .

Q. [C]an you comment as to whether or not the failure to present this evidence caused Judge Abel to make his findings?

A. I can comment that, in my opinion, the evidence that was offered and admitted at trial caused Judge Abel to make the decision that he made.

The evidence, viewed in the light most favorable to the jury's causation findings, including the mass of evidence the jury received that the bankruptcy judge never saw and the testimony of expert witness Steve Peterson, constituted legally sufficient evidence to support a finding that the result of the bankruptcy court adversary proceeding would have been different, in a way favorable to Turtur & Associates, Inc., if it wasn't for the negligence of Tom Alexander and his firm. Accordingly, the trial court erred in disregarding the jury's answers on causation.

We sustain issue one.

## C. Negligence and DTPA

■ In cross-point one,[9] appellees argue that, even if there was legally sufficient evidence of causation, there is no legally sufficient evidence to support the jury's finding of negligence in response to jury question one, nor is there any evidence to support the jury's other findings in response to question four. We note that appellees did not raise these arguments in the trial court, and for good reason. The evidence we have already summarized constitutes legally sufficient evidence to support the jury's findings in response to question one and four.

We overrule cross-point one.

## D. Factual Sufficiency

In cross-points two and three, appellees assert the evidence is factually insufficient to support the jury's causation findings in jury questions Nos. 1, 4, 5, 6, and 7.

9. Appellees bring cross-points pursuant to

When reviewing the record to determine the factual sufficiency of the evidence, to support a jury verdict, we consider all the evidence in the case and set aside the verdict only if we conclude the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

As to the jury's answers to questions Nos. 1, 4, 5, 6 and 7, appellees argue that, contrary to the testimony of plaintiffs' witnesses already summarized, Ms. Mingledorff and Mr. Alexander gave testimony "as to why certain evidence was not presented at the Adversary Proceeding, why it would not have changed Judge Abel's decision in the case, and how certain admitted evidence was harmful to Turtur & Associates' positions." The jury, as the trier of fact, can believe, or disbelieve, any witness. The testimony of Mr. Alexander and Ms. Mingledorff was conflicting in some material respects, as set out earlier in this opinion. The jury heard the evidence that was before the bankruptcy judge, heard the mass of evidence that was never presented to the bankruptcy judge, heard the conflicting explanations of why the evidence was not presented to the bankruptcy judge, and heard conflicting expert testimony as to whether the attorneys were negligent in their handling of the case. We cannot say the jury's findings in response to questions 1, 4, 5, 6 and 7 were so against the great weight and preponderance of the evidence as to be manifestly unjust.

We overrule cross-points two and three.

## III. Post–Verdict Trial Amendment; Damages

■ In issue two, Turtur & Associates, Inc. asserts the trial court abused its

TEX.R. CIV P. 324(c).

discretion when it denied leave to file a post-verdict trial amendment to conform the pleadings with the verdict. The trial court's order states:

> On the 21st day of November 1996, came on to be heard Plaintiff's Motion for Leave to File Fifth Amended Petition. (See Final Judgment of even date for further recitations.) Defendants Tom Alexander, individually, and Alexander & McEvily objected separately on both the basis of surprise and the basis of prejudice.
>
> The Court finds as follows: Court Exhibit 27 establishes the underlying available insurance coverage as $850,000. The underlying adversary action claim (the case within the case), had a maximum claim of $479,631.20. At a pretrial conference, pursuant to Rule 166, a pleading cutoff was entered effective October 7, 1996, two weeks before the trial began. No relief was ever obtained to amend any pleadings, nor was any requested until Plaintiff's current motion. The case was tried giving each side 30 hours, which was exceeded by the Plaintiff, but was not fully utilized by the Defendants. Additional experts and fact witnesses were listed by the Defendants, but were not called. The Plaintiff during summation essentially argued for $2.1 million in actual damages.
>
> The Court further finds as follows: That the pleadings in this case have never exceeded $655,000 since suit was filed in 1989. Other potentially vital discovery, expert witnesses and fact witnesses were available to the Defendants had the damage claim been made in excess of either the underlying adversary claim of $479,631.20 or the insurance coverage as reflected in Court Exhibit 27 (or the pleadings of $655,000).

> Based upon all the competent evidence, the Court finds both substantial prejudice and surprise.
>
> It is accordingly ordered that Plaintiff's Motion for Leave to File Fifth Amended Petition is denied.

Under Rules 63 and 66,[10] a trial court must allow a trial amendment that increases the amount of damages sought in the pleadings to that found by the jury unless the opposing party presents evidence of prejudice or surprise. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex.1990). The record supports the trial court's statements in its order quoted above. We note that unsworn, unobjected to, factual statements and representations by attorneys can constitute evidence supporting a trial judge's ruling. *See McBee v. State*, 981 S.W.2d 694, 696 (Tex.App.—Houston [1st Dist.] 1998, pet. ref'd.); *Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997); *In re Butler*, 987 S.W.2d 221, 225 (Tex.App.—Houston [14th Dist.] 1999, no pet.).

Further, it does not clearly appear from the record that there was a trial by consent of damages in excess of those pled. *See Re/Max of Texas, Inc. v. Katar Corp.*, 961 S.W.2d 324, 328 (Tex.App.—Houston [1st Dist.] 1997, writ denied) (stating that trial by consent is intended to cover exceptional case where it clearly appears that parties tried the unpled issue).

We conclude there was no abuse of discretion. Accordingly, we overrule issue two.

In cross-points four through six, appellees assert the evidence is factually insufficient to support the jury's answer to question No. 8, which reads as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably

---

10. Tex.R. Civ P. 63 and 66.

compensate Turtur & Associates, Inc. for its damages, if any?

Answer: $3,000,000.00

In light of the trial court's order, discussed in issue two, limiting Turtur & Associates to the amount of damages pled and proved, we consider these cross-points to be moot. In its final judgment, the trial court specifically states:

> With regard to Question No. 8, it is further found by the Court that there are no pleadings and no legally competent evidence to support any of the jury verdict in excess of the underlying bankruptcy claim in the amount of $479,631.20.

Appellees do not attack this finding.

We overrule cross-points four through six.

## IV. Pre–Trial Summary Judgment

In issue three, appellants assert the trial court erred in granting the pre-trial summary judgment on the Turturs' claim for the unauthorized sale of their cattle.

### Background

On October 3, 1987, 34 cattle owned by Mario Turtur and Steve Turtur, d/b/a Turtur Family Partnership, were sold at a disbursal sale at the McKellar Ranch in Mt. Pleasant, Texas. The Turturs allege that Judy Mingledorff, the same attorney who tried the adversary proceeding, sold the cattle without their permission. It is undisputed that Stephen Turtur was aware of the sale no later than October 30, 1987, within a month after the sale.

The original petition in this case was filed on November 30, 1989. The plaintiff was Turtur & Associates, Inc., and the claim was that appellees had committed legal malpractice in connection with the trial of the adversary proceeding in the bankruptcy court. The Turtur Family Partnership was not a plaintiff at that time.

On October 5, 1990, a first amended petition was filed in the case on behalf of Turtur & Associates, Inc., and its "principals," Mario, Chris and Stephen Turtur. The same legal malpractice claims are asserted. The Turtur Family Partnership was not a plaintiff at that time.

On August 16, 1991, a plaintiffs' second amended original petition was filed on behalf of Turtur & Associates Inc., and Mario Turtur and Stephen Turtur d/b/a Turtur Family Partnership. For the first time, allegations were made that appellees committed negligence and legal malpractice when, "[i]n the course of representing TURTUR & ASSOCIATES, INC., Defendants also came to represent MARIO TURTUR and STEPHEN TURTUR d/b/a Turtur Family Partnership with respect to claims involving cattle in the embryo transplant program...." In a third amended petition, the Turturs alleged they did not become aware of damages caused by the wrongful sale of the cattle until June 17, 1988.

Appellees filed a motion for partial summary judgment asserting that the claim of the Turtur Family Partnership alleging legal malpractice in connection with unauthorized sale of the cattle was barred by the two-year statute of limitations because the sale occurred in October 1987, and the Turturs did not plead, or suggest the claim in any pleading, until they filed their second amended petition in August 1991. Appellees further asserted that even if the Turturs did not discover their damages until June, 1988, the August 1991 assertion of their claim was too late. The trial court granted partial summary judgment.

The Turturs assert the trial court erred because the original petition filed Novem-

ber 30, 1989 was sufficiently broad to cover the claim of the Turtur Family Partnership. We disagree. The Turtur Family Partnership was not even named as a party in the original petition. The only allegations of negligence and malpractice asserted in the original and first amended petitions related to the bankruptcy adversary proceeding involving the claims of the corporation, Turtur & Associates, Inc.

 It is true that if an amended petition does not allege a wholly new, distinct or different transaction, then any added claims relate back to the original filing and are not subject to a limitations defense. *See Ex parte Goad,* 690 S.W.2d 894, 896 (Tex.1985). Here, however, the second amended petition, for the first time, alleged a wholly new, distinct and different transaction. Therefore, the added claims of Mario and Stephen Turtur d/b/a Turtur Family Partnership did not relate back to the filing of the original petition. The trial court properly granted the partial summary judgment.

We overrule issue three.

## CONCLUSION

We reverse the judgment and remand the case to the trial court for entry of judgment in accordance with this opinion.[11]

ANDELL, J., not participating.

## ORDER OVERRULING MOTION FOR REHEARING EN BANC

PER CURIAM.

Appellees' motion for rehearing en banc is **OVERRULED.**

This Court's previous opinion of October 31, 2001 is **ORDERED PUBLISHED.**

---

**11.** We note that the judgment should reflect the findings in the trial court's final judgment regarding reasonable attorney's fees and actual damages, the jury's findings regarding ad-

A majority of the justices of the Court vote to overrule the motion for rehearing en banc.

Justice TAFT dissents from the overruling of the motions for rehearing en banc.

Justice RADACK joins Justice TAFT's opinion dissenting from the overruling of the en banc rehearing.

Justices JENNINGS and KEYES not participating.

## OPINION DISSENTING FROM OVERRULING OF MOTION FOR REHEARING EN BANC REVIEW

TIM TAFT, Justice.

The Panel Opinion recognized the rule that expert testimony is necessary to prove the element of causation in a legal malpractice case, but claimed an exception exists where the causal relationship between the attorney's negligence and the client's loss is so obvious that lay persons are competent to resolve the issue. As a threshold issue, I question whether such an exception exists. The only authorities cited for such an exception were a Texas Court of Appeals decision reversed on other grounds and a Fifth Circuit Court of Appeals decision.

Even if such an exception existed, however, the Panel Opinion did not set out any evidence that the federal bankruptcy judge would have made a different decision if a different lawyer had been trying the lawsuit and additional evidence had been submitted. Thus, I am perplexed how a jury of lay persons could be expected to make that decision without expert help.

ditional or exemplary damages, as well as prejudgment and post judgment interest and the assessment of costs as provided by law.

The Panel Opinion is lengthy, and it presents a great deal of evidence about what evidence should have been presented by whom, and even expert evidence regarding appellees' negligence. I do not see a single shred of evidence, however, that a different decision would have been made by the federal bankruptcy judge in the face of the evidence appellants claim should have been introduced by Tom Alexander, himself. Accordingly, I respectfully dissent from the en banc decision to deny motion for rehearing.